Filed 12/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B301050 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA400013-02) |
| v. | |
| EDGAR A. LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge. Convictions affirmed, certain gang and firearm enhancements and special circumstances vacated and remanded for new trial.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Edgar Lopez was convicted of the first degree murders of Steven Robinson, Aric Lexing, and Scott Grant (Pen. Code, § 187)[1] and sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), with associated enhancements and special circumstances found true.  On appeal, Lopez contends: (1) insufficient evidence supported the jury's finding on one firearm enhancement allegation; (2) the trial court should have given his requested jury instruction on the mental state required for aiding and abetting a murder; (3) the court erred in admitting evidence pertaining to a traffic stop of the car in which Lopez was riding shortly after the Lexing and Grant murders; (4) the court erred in excluding third party culpability evidence; and (5) the cumulative effect of the errors deprived him of due process of law and a fair trial.  In supplemental briefing, Lopez argues that certain enhancement and special circumstance findings must be vacated and the matter remanded for a limited retrial due to statutory changes made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699). We affirm the convictions, but vacate the gang-related special circumstance and enhancement findings and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Robinson was shot to death on March 9, 2007; Grant and Lexing were shot to death on July 20, 2007.  The killings took place near the territory of the 18th Street gang, and the bullets that struck Robinson and Grant were fired from the same handgun.  The crimes went unsolved for several years, until an

---

[1]     All further references are to the Penal Code unless otherwise indicated.

FBI informant within the 18th Street gang recorded a conversation involving two high level members, Lopez and Gustavo Guzman. Lopez and Guzman reminisced about two shootings they had carried out, and they provided enough detail about the crimes and subsequent events to permit the Los Angeles Police Department to determine they were discussing the killings of Robinson, Grant, and Lexing.

Lopez was charged with the murders of Robinson (count 1), Grant (count 2), and Lexing (count 3), with multiple firearm enhancements and a gang enhancement alleged for each murder charge (§§ 187, 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(e)(1)). Two special circumstances were alleged: (1) Lopez intentionally committed each murder while he was an active participant in a criminal street gang and the murder was committed to further the activities of the gang (§ 190.2, subd. (a)(22)), and (2) Lopez was convicted of multiple murders (§ 190.2, subd. (a)(3)). Lopez was also charged with two counts of selling methamphetamine, also with a gang enhancement allegation (§ 186.22, subd. (b)(1)(A), Health & Saf. Code, § 11379, subd. (a)) (counts 4 and 5); one count was later dismissed.

The jury found Lopez guilty of three first degree murders and the sale of methamphetamine. For all three murders, the jury found true the special allegation that a principal personally and intentionally discharged a firearm, causing the victim great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)); in the Lexing and Scott murders, the jury also found true allegations that Lopez personally and intentionally discharged a firearm, which caused Lexing and Scott great bodily injury or death (§ 12022.53, subd. (d)). The jury found all four offenses were

3

committed for the benefit of a criminal street gang. Finally, the jury found the special circumstances allegations true.

The prosecution sought the death penalty, but the jury selected a sentence of life in prison without the possibility of parole. For each of the three murders, Lopez was sentenced to life in prison without the possibility of parole, plus a sentence of 25 years to life for the firearms enhancement in section 12022.53, subdivision (d). Additionally, the court imposed the mid-term of three years for the drug offense, plus three years for the gang enhancement. The court designated the sentences to run consecutively. Lopez appeals.

## DISCUSSION

### I. Lexing Murder: Firearm Enhancement Finding

Section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" during the commission of the offense. Lopez contests the jury's true finding that he personally discharged a firearm, causing Lexing's death. He argues the jury's finding under section 12022.53, subdivision (d) must be vacated because there was no evidence to support the jury's conclusion that he, as opposed to Guzman, personally fired the shot that struck and killed Lexing.

Sufficient evidence supports the jury's finding. Lexing and Grant were killed in a single incident. Grant was found dead in the front passenger seat of Lexing's car, with his seat belt still on. The driver's side door was open and the driver's seat empty; Lexing was discovered lying face-down in the gutter nearby. Grant had been shot multiple times with both .40- and .45-caliber

4

bullets, suggesting he was shot with two separate firearms. The injuries to Grant's body were consistent with him having been shot through both the passenger's side window of the car and the rear of the driver's side of the car. Also indicating there were two shooters were the locations of casings recovered from the scene: .40-caliber casings were found in front and to the right of the car, and .45-caliber casings were located to the left and to the back of the car. Lexing had been shot once in the back as he fled from the car.

As both Lopez and the People acknowledge, section 12022.53, subdivision (d) requires proximate causation, not actual causation. Therefore, the validity of the jury's finding rests not on whether Lopez fired the shot that actually killed Lexing, but on whether Lopez's personal and intentional discharge of a firearm proximately caused great bodily injury or death. A proximate cause of great bodily injury " 'is an act . . . that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act . . . the great bodily injury or death and without which the great bodily injury or death would not have occurred.' " (*People v. Bland* (2002) 28 Cal.4th 313, 335.) Consistent with this authority, the jury was instructed with CALJIC No. 17.19.5, defining a proximate cause of death as "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death and without which the death would not have occurred."

The evidence was sufficient to permit the jury to conclude that regardless of which defendant fired the shot that killed Lexing, Lopez personally and intentionally discharged a firearm, proximately causing Lexing's death. The act that set in motion

5

the chain of events resulting in Lexing's death was the act, committed by both defendants, of firing a flurry of gunfire into the car in which Lexing and Grant were seated:  Lopez and Guzman, standing on opposite sides of the car, both fired repeatedly into the car, killing Grant and prompting Lexing to flee, only to be shot and killed as he ran away.

Lopez argues this case is like *People v. Botello* (2010) 183 Cal.App.4th 1014, in which the People conceded a section 12022.53, subdivision (d) enhancement should be vacated because one identical twin discharged a handgun and the other merely drove the vehicle, and there was no evidence to indicate which twin was the actual shooter.  Here, in contrast to *Botello*, both Lopez and Guzman fired into the vehicle where Lexing and Grant were sitting, setting in motion the chain of events leading to the deaths of both victims.  *Botello* is inapposite here, and the jury's finding was supported by sufficient evidence.

## II.    Robinson and Lexing Murders:  Jury Instruction on Aiding and Abetting

A defendant aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, or instigate the perpetrator's commission of that crime.  (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167 [a conviction for first degree premeditated murder on direct aiding and abetting principles requires "that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission"], superseded by statute on another ground as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3; *People v. Hamilton* (1989) 48 Cal.3d

1142, 1169–1170 ["to be an aider and abettor as a matter of law an individual must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense' "].)

The jury was thoroughly instructed on principles of aider and abettor liability. The court gave CALJIC No. 3.01: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] To be guilty as an aider or abettor, a defendant's intent or purpose of committing or encouraging or facilitating the commission of the crime by the perpetrator must be formed before or during the commission of the crime. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

The court also instructed the jury with CALJIC No. 3.00, which defines principals in a crime and provides that when the charge is murder, "the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person[']s own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly,

7

the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state."

The jury was also instructed with CALJIC No. 8.70, a short instruction stating there are two degrees of murder and if the jury determines that a defendant is guilty of murder, it must also determine whether the murder is of the first or second degree. Additionally, the court gave CALJIC No. 8.71, which provides that if the jury is convinced beyond a reasonable doubt that a defendant committed murder, but has a reasonable doubt as to whether the murder was in the first or second degree, it must give the defendant the benefit of the doubt and return a verdict finding the defendant guilty of second degree murder and not guilty of first degree murder.

Lopez argues the trial court erred when it refused to instruct the jury with his proposed modification to CALJIC No. 8.70. That modification would have appended the following language to the two sentences that make up CALJIC No. 8.70:

"If you are convinced beyond a reasonable doubt that a defendant is the actual perpetrator of any of the murders alleged in counts 1, 2, or 3, in order to return a verdict of first degree murder you must all agree that the defendant was proven beyond a reasonable doubt to have committed a willful, deliberate, and premeditated killing as that has been defined for you in another instruction.

"If you are convinced beyond a reasonable doubt that a defendant is the actual perpetrator of any of the murders alleged in counts 1, 2, or 3, but have a doubt as to whether the killing was willful, deliberate, and premeditated you must give the defendant the benefit of that doubt and return a verdict of second degree murder as to that killing.

8

"If you have a reasonable doubt that a defendant was the actual perpetrator of any of the murders alleged in counts 1, 2, or 3, you may still find him guilty of murder if you find that he aided and abetted the actual perpetrator of the killing as that has been defined for you in another instruction.

"If you find beyond a reasonable doubt that a defendant aided and abetted the actual perpetrator of any of the murders alleged in counts 1, 2, or 3, and have found that that murder was murder of the first degree, in order to return a verdict of first degree murder as to an aider and abettor you must all agree that that person acted with knowledge that the perpetrator of the murder intended to carry out a willful, deliberate, and premeditated killing, that he intended to encourage or facilitate such a killing, and that he did, by act or advi[c]e, aid, promote, encourage or instigate the commission of such a killing.

"If you find beyond a reasonable doubt that a defendant aided and abetted the actual perpetrator of any of the murders alleged in count 1, 2, or 3, and have found that that murder was murder of the first degree but have a doubt as to whether he acted with knowledge that the actual perpetrator of the murder intended to carry out a willful, deliberate, and premeditated killing, or that he intended to encourage or facilitate such a killing, or that he did, by act or advi[c]e, aid, promote, encourage, or instigate the commission of the killing you must give the defendant the benefit of that doubt and return a verdict of second degree murder as to that killing as to that defendant."  (Italics omitted.)

The trial court rejected Lopez's proposed modification, expressing concerns that its length "lends itself to error" and questioning whether it was a fully correct statement of the law.

9

We review claims of instructional error de novo (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570), and conclude the court did not err.  " '[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*People v. Scully* (2021) 11 Cal.5th 542, 592.)

The requested modification was duplicative, confusing, and unnecessary.  The first two paragraphs of the modification, concerning the liability of actual perpetrators, are entirely duplicative of other instructions, and Lopez does not make any argument on appeal about this portion of his proposed modification.  Similarly, Lopez does not assert on appeal that the court erred by not giving the third paragraph of his proposed modification, the paragraph stating that if the jury has a reasonable doubt whether a defendant was the actual perpetrator, the defendant may be guilty of murder if he or she aided and abetted the other defendant in the killing.  This, too, was addressed in other instructions given to the jury, namely CALJIC No. 3.00.

Instead, Lopez focuses on the final two paragraphs of his proposed modification.  According to Lopez, because the court declined to modify the instruction, the jury was not instructed the aider and abettor must have acted willfully with premeditation and deliberation, and therefore the jury could have convicted Lopez of the murders of Robinson and Lexing as an aider and abettor who acted with knowledge of Guzman's intent to commit a murder even if he (Lopez) did not act willfully with

premeditation and deliberation.[2]  Additionally, he argues the jury instructions "failed to establish that an aider and abettor could be convicted only of second-degree murder unless the jury found the aider and abettor acted with knowledge that the direct perpetrator intended to carry out a willful, deliberate, and premeditated killing."[3]

---

[2]      Lopez primarily bases this argument on the California Supreme Court's decision in *People v. Chiu, supra,* 59 Cal.4th 155.  In *Chiu,* the jury had been instructed with alternate theories of liability:  direct aiding and abetting in a murder and aiding and abetting the principal in the target offense of assault or disturbing the peace, the natural and probable consequence of which was murder.  (*Id.* at p. 160.)  The Supreme Court held an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine.  (*Id.* at pp. 158–159.)  It did not change the law concerning convictions for first degree premeditated murder based upon direct aiding and abetting principles.  (*Id.* at pp. 166–167.)  No natural and probable consequences theory was involved in this case, so *Chiu* is inapposite.

[3]      Lopez cites no authority directly supporting this contention, arguing instead by analogy from *People v. Dennis* (2020) 47 Cal.App.5th 838, review granted July 29, 2020, S262184, in which the Court of Appeal found that when a defendant is charged with attempted premeditated murder on a natural and probable consequences theory, the jury must be instructed that attempted premeditated murder, not merely murder, was a natural and probable consequence of the target offense.  (*Id.* at p. 854.)  Again, as no natural and probable consequences theory was asserted in this case, *Dennis* is of no utility.

11

We consider the instructions as a whole to determine whether there is a reasonable likelihood the jury misunderstood the instructions as the defendant contends. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) We conclude the instructions as a whole could not reasonably be interpreted as Lopez suggests. CALJIC Nos. 3.00 and 3.01 focused the jury's attention on the defendants' individual mental states as to the murders, specifically noting an aider and abettor's culpability could be greater or lesser than that of the actual perpetrator. The jury instructions given on murder and the degrees of murder (CALJIC Nos. 8.00, 8.10, 8.11, 8.20, 8.30, 8.70) made it clear a defendant could not be found guilty without possessing the required mental state and only a premeditated murder would be first degree murder. The jury was instructed to decide separately whether each defendant was guilty or not guilty (CALJIC No. 17.00). The jury was further instructed that any doubt as to a defendant's liability for murder in the first or second degree had to be resolved in that defendant's favor (CALJIC No. 8.71), and there had to be unanimous agreement as to whether a defendant was guilty of first degree murder or second degree murder (CALJIC No. 8.74).

Because the instructions given by the court told the jury only a premeditated murder was a first degree murder (CALJIC No. 8.20) and it made clear it was the aider and abettor's own mental state that determined his culpability (CALJIC No. 3.00), there were only two ways the jury could find Lopez guilty of first degree murder: jurors either had to conclude Lopez was the actual shooter and acted with premeditation, or they had to find he deliberately intended to aid and abet Guzman's premeditated murder. Therefore, any determination that Lopez was an aider and abettor required a conclusion that he intended to further

12

Robinson's and Lexing's premeditated killings. While the California Supreme Court has noted that intent to kill establishes express malice (§ 188) but "does not itself establish deliberation and premeditation," it has also observed that " '[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 847.) There is no reasonable likelihood that the jury convicted Lopez of the murders of Robinson and Lexing as an aider and abettor without concluding he acted with premeditation and deliberation and that he knew Guzman intended to carry out a willful, deliberate, and premeditated killing.

## III.  Failure to Suppress Evidence of the Traffic Stop and Associated Evidence

Lopez and Guzman were stopped by a sheriff's deputy minutes after they shot Grant and Lexing; the traffic stop was near the location of the killings. Although their vehicle was searched because Guzman was on parole, no evidence was recovered, and the deputy, unaware of the recent shooting, allowed the men to leave. At trial, Guzman filed a motion to suppress evidence of the stop; Lopez joined in the motion. The trial court denied the motion to suppress on multiple grounds, one of which was that the traffic stop had a lawful basis: the vehicle's headlights were off in the middle of the night.

Lopez contends the trial court erred when it found the traffic stop was lawful because its finding that the stop was based on the vehicle's lights being off was not supported by substantial admissible evidence. Accordingly, Lopez argues the court should

13

have suppressed "the fact that the GMC Envoy with the particular license plate was being driven and was subsequently stopped at that particular time," as well as the fact that Lopez and Guzman were the occupants of the vehicle. When reviewing challenges to the factual findings made by the trial court at a suppression hearing, we defer to the superior court's express and implied factual findings if they are supported by substantial evidence. (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).) "As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) "Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling' [citation]. Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Tully*, at p. 979.)

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the evidence was sufficient to support the court's finding that the stop was prompted by the vehicle being operated at night without headlights. The deputy who pulled over Guzman and Lopez, Gabrielle Graves, testified she stopped the vehicle because it was approximately 3:00 a.m., it was dark outside, and the vehicle's headlights were off. At the hearing, which took place nearly a decade after the traffic stop, the deputy testified she initially had no independent recollection of the stop, but her recollection had been refreshed when she

14

reviewed documents. Specifically, Graves testified she had reviewed the testimony she had given before the grand jury and looked at a log that described the stop as a "suspicious person" stop, and from that she was able to remember that the vehicle had no lights on, even though the headlights were not mentioned in the documents she reviewed. The trial court found Graves's recollection of the reasons for the stop were "extremely nebulous and greatly suffered in terms of specificity," and it described her as "a horrible witness." However, the court rejected defendant Guzman's argument that Graves had committed perjury in her testimony, it did not reject her testimony, and it concluded Graves initiated the traffic stop because the vehicle's headlights were off. We " 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Tully, supra,* 54 Cal.4th at p. 979.)

Lopez focuses on the trial court's assertion that the testimony of a deputy who responded to the scene as Graves's backup was "more clear as to the basis for the stop." He argues this deputy's testimony that Graves told him she had stopped the vehicle because its headlights were off was inadmissible hearsay, and that "once the inadmissible hearsay is removed from the calculation," the case is akin to *U.S. v. Burke* (D. Md. 2009) 605 F.Supp.2d 688, in which a traffic stop was found to be unlawful where the detective did not remember the reason for the traffic stop and there were no contemporaneous documents describing the basis for the stop. This case is not like *Burke*, however. Even if we accept for the sake of argument that the second deputy's testimony was inadmissible hearsay, we are not left with a law enforcement officer who did not remember the reason for the traffic stop, as was the situation in *Burke*. Graves

15

was far from an ideal witness, as the trial court noted, and her recollection varied, but she did testify she remembered stopping the vehicle because its lights were off; and she explained, when questioned by the trial court, that from reviewing the documentation relating to the traffic stop, she was able to remember that the vehicle's headlights had been off, prompting her to stop the vehicle. Lopez has not established any error.

## IV.     Third Party Culpability Evidence

"[T]hird party culpability evidence may be admitted if it is relevant and its probative value is not substantially outweighed by the risk of undue delay, prejudice, or confusion, or otherwise made inadmissible by the rules of evidence. [Citations.] 'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.' [Citation.] For example, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt. . . . ' [Citation.] Moreover, admissible evidence of this nature points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime. [Citations.] For the evidence to be relevant and admissible, 'there must be *direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*' [Citation.] As with all evidentiary rulings, the exclusion of third party evidence is reviewed for abuse of discretion." (*People v. Turner* (2020) 10 Cal.5th 786, 816-817 (*Turner*).) Lopez argues

16

the trial court erred in excluding three types of third party culpability evidence. We consider each in turn.

### A. .45-Caliber Firearm

The same .45-caliber firearm was used in the Robinson murder in March 2007 and the Grant/Lexing murders in July 2007. The People moved to exclude evidence that on the night of June 10, 2007, the same weapon was fired into the home of Javier Carrillo at 210 E. 93rd Street, striking him. An unidentified person reported hearing gunshots and "observed what appeared to be a male black figure standing in front of 208 E. 93rd Street." She reported the "male black figure got into an unknown type [b]lack vehicle and drove off." Six .45-caliber casings were recovered from 208 E. 93rd Street. Firearms analysis showed the casings were fired from the same weapon that was fired at the Lexing/Grant murder scene, and therefore, from the weapon used to kill Robinson.

The court excluded this evidence, stating that for third party culpability evidence to be admissible, "[Y]ou have to show not only that it was this third party, but somehow link it to this crime. [¶] Even if you had a third party identified as discharging a .40 or .45 caliber weapon, then you still need to show, under third-party culpability, some link to this case by that third party, even if that person had the opportunity or the motive to have committed the crime. [¶] That's not enough under the law."

Lopez argues the court erred in excluding evidence of the Carrillo shooting. He contends the evidence of an unidentified third party who is Black, when Lopez and Guzman are Hispanic, "directly implicated a third party in the charged offenses." Not so. The only evidence here was that an eyewitness identified a person in the vicinity of the Carrillo shooting as Black and as

17

leaving the area in a car. The eyewitness did not observe the shooting, nor did she identify the figure she saw beyond "Black" and "male." Evidence suggesting another person possessed the firearm during the months between the murders charged here does not raise a reasonable inference that someone other than Lopez or Guzman committed the shootings charged in this case. Admissible third party culpability evidence "points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime. [Citations.] For the evidence to be relevant and admissible, 'there must be *direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*' " (*Turner, supra,* 10 Cal.5th at pp. 816–817.) Here, the evidence at best links a third party to the instrument used in the crime; it does not link that third party to the actual perpetration of the charged murders.

Lopez likens this case to *People v. Basuta* (2001) 94 Cal.App.4th 370, where evidence that a mother had previously shaken her baby was excluded at the trial of a daycare operator charged with inflicting injuries causing the child's death. The reviewing court concluded it was error to exclude the evidence because it would have allowed the jury to conclude the child died from a rebleed of a prior brain injury that previously had been inflicted by the child's mother rather than from a violent assault by the daycare operator. (*Id.* at p. 387.) Lopez argues this case is like *Basuta* because both cases involve a cause of death being linked to another individual: In *Basuta*, the possible cause of death was shaken baby syndrome, directly linked to the child's mother, while here the cause of death was the .45-caliber firearm in the hands of the third party who performed the Carrillo

shooting. But in *Basuta*, the third party culpability evidence directly connected the mother's actions to the death of her child; that is very different from the situation presented here, which merely establishes that at some point between the charged offenses, the weapon used to commit the charged offenses may have been used by someone other than Lopez or Guzman. This ostensible third party culpability evidence failed to directly link any third party to the actual murders of Robinson, Grant, or Lexing, and the trial court properly excluded the evidence.

B.   *.40-Caliber Firearm*

A .40-caliber firearm was used in the Lexing and Grant murders in July 2007. The trial court excluded evidence the same .40-caliber firearm was fired in April 2007 and that it may have been used in a pawn shop robbery in November 2007 in which the suspect was described as an African-American male. Specifically, a cartridge casing recovered from the pawn shop robbery was identified as potentially linked with the casings from the Lexing and Grant murder, but no confirmatory analysis was ever performed and the firearm was later destroyed. The weapon used in the pawn shop robbery was recovered in April 2009 in conjunction with the arrest of a Rolling 60's gang member. Lopez argues this evidence raised a reasonable doubt as to his culpability because it demonstrated the firearm potentially had been used in another crime by a suspect whose description did not match Lopez or Guzman's description, and the potential murder weapon was found in the possession of a different individual.

The trial court did not abuse its discretion. None of this evidence linked any third party to the murders. The facts that the weapon was fired three months before the murders and that

19

three months after the murders it may have been used in another crime simply does not directly link any third party to the shooting deaths of Lexing and Grant. (See *Turner*, *supra*, 10 Cal.5th at p. 817.)

C. *Glen McNeil*

Guzman, joined by Lopez, attempted to introduce evidence Grant had told friends he had caused a gang member's girlfriend to be arrested and he was afraid for his life. According to Guzman's counsel, "[t]here is also a suggestion that [Grant] may have robbed the girlfriend" of drugs or money. One of Grant's friends, Eric Dotson, took Grant to the police station the day before Grant's death. Grant identified the gang member in question as "Outlaw," "Castro," or "Peso," and Dotson later identified "Castro" as Glen McNeil, a member of the Crips. Cell phone records for McNeil indicated he placed a telephone call the night of the Grant and Lexing murders at 3:35 a.m., a few minutes after the shooting.

The prosecution advised the court McNeil had been a person of potential interest who was eliminated from consideration by the police. The People proffered a cell tower analysis demonstrating McNeil was not in the area of the murders when he made the 3:35 a.m. telephone call. The court excluded evidence pertaining to McNeil, finding even if McNeil had a motive to kill Grant, there was no link to the actual killings.

On appeal, Lopez argues the trial court abused its discretion when it excluded this evidence. He contends three facts linked McNeil to Grant's murder: Grant's report to law enforcement that he was being targeted by a gang member; Grant's 12 bullet wounds compared to the single shot that hit

Lexing, suggesting Grant was the primary target of the shooting; and McNeil's phone call shortly after the murders. Lopez acknowledges the People's representation that McNeil was not in the vicinity of the shooting when he placed his telephone call, but he suggests McNeil "could have either driven away or, alternatively, acted as a coordinator of the shooting."

The trial court did not abuse its discretion in excluding this evidence. " '[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt.' " (*Turner*, *supra*, 10 Cal.5th at p. 816.) There must be evidence tending to directly connect that person with the actual commission of the offense. (*People v. Yeoman* (2003) 31 Cal.4th 93, 140–141.) At most, the evidence suggested McNeil had a possible motive to kill Grant, but there was no evidence directly linking him to the actual commission of the shootings. If anything, the evidence tended to demonstrate McNeil was not present when the murders were committed; Lopez's argument he might have fled the area or coordinated the shooting is purely speculative. Lopez has not demonstrated any error here.

## V.    Assembly Bill No. 333

Lopez asked for leave to file supplemental briefing regarding the impact of newly enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) on this case. (See Stats. 2021, ch. 699, §§ 1–5.) Assembly Bill 333 amends section 186.22 to require proof of additional elements to establish a gang enhancement. (Assem. Bill 333, § 3, amended § 186.22, eff. Jan. 1, 2022.) We granted Lopez's request and received briefing from both parties.

21

Lopez asserts that Assembly Bill 333 should be applied retroactively to his case and that, under the new law, there is insufficient evidence to support imposition of not only the gang enhancements under section 186.22 but also the related special circumstance findings under section 190.2, subdivision (a)(22) and the firearms enhancements under section 12022.53, subdivisions (d) and (e)(1).  He asks us to strike the true findings on these allegations and remand the matter so the prosecutor can either elect to retry the allegations or the trial court can resentence him.

The People concede that Lopez is entitled to the ameliorative effects of Assembly Bill 333's amendments to section 186.22 because his judgment will not be final when the new legislation takes effect.  They argue, however, that substantial evidence was presented or could have been presented to support Lopez's gang enhancement, even under the amended statute, and thus remand would be an idle act.  We conclude that the amendments to section 186.22 apply retroactively here and that the special circumstances and enhancement allegations that are based on that statute must be vacated and the matter remanded.

### A.    Retroactivity

When Assembly Bill 333 goes into effect on January 1, 2022, Lopez's judgment will not yet be final.  In *In re Estrada* (1965) 63 Cal.2d 740, 744–746, the California Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308; *People v. Brown* (2012) 54 Cal.4th 314, 323.)  This principle also applies when an

enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement.  (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70–71 (*Figueroa*).)  As Assembly Bill 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement, we agree with Lopez and the People that Lopez is entitled to the benefit of this change in the law.  "[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case." (*Id.* at p. 68.)

B.       *Statutory Framework and Impact of Assembly Bill 333*

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  A " 'criminal street gang' " is defined under current law as "any *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (*Id.*, subd. (f), italics added.)  Effective January 1, 2022, Assembly Bill 333 narrows the definition of " 'criminal street gang' " to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary

23

activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Assem. Bill 333, § 3; amended § 186.22, subd. (f), eff. Jan. 1, 2022, italics added.)

At trial, the People introduced evidence that gang member William Vasquez committed two murders in 2005 and gang member Guillermo de Los Angeles committed a carjacking and robbery in 2005. The evidence that these gang members individually engaged in a pattern of criminal gang activity was sufficient at the time of trial to meet the requirements of section 186.22, but when it becomes effective, Assembly Bill 333 will require the prosecution to prove collective, not merely individual, engagement in a pattern of criminal gang activity. No evidence was introduced at trial to establish that the crimes committed by Vasquez and de Los Angeles constitute collective criminal activity by the 18th Street gang.

Assembly Bill 333 also altered the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang. Currently, a "pattern of criminal gang activity" means "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) As of the effective date, Assembly Bill 333 redefines "pattern of criminal gang activity" to require

24

that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational."  (Assem. Bill 333, § 3; amended § 186.22, subd. (e)(1), eff. Jan. 1, 2022.)  In addition, the currently charged offense cannot be used as a predicate offense under the amendments.  (*Id*., subd. (e)(2).)

Thus, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense.  (Assem. Bill 333, § 3, amended § 186.22, subd. (e)(1)–(2), eff. Jan. 1, 2022.)  With respect to common benefit, the new legislation explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (Assem. Bill 333, § 3, amended § 186.22, subd. (g), eff. Jan. 1, 2022.)

Although the People did submit evidence of two predicate offenses that were committed in the new time frame, the People did not prove that the predicate offenses commonly benefitted a criminal street gang and that the benefit was more than reputational. The People argue that the omission of proof that the predicate offenses commonly benefitted a criminal street gang in a way that was more than reputational was harmless because there exists evidence that they benefitted the gang in a way compliant with the new statutory provisions. However, the evidence described by the People in their supplemental briefing was not evidence presented to the jury in this case—instead, the People draw their information from unpublished appellate decisions concerning Vasquez and a codefendant of De Los Angeles. We are not aware of any authority that would permit this court to draw on evidence not presented to the jury but derived from appellate opinions in other cases to support the gang allegations here. Lopez has a constitutional right to a jury trial on every element of the charged enhancement. (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104 (*Ramos*); *Figueroa, supra,* 20 Cal.App.4th at p. 71.)

Additionally, the jury was not prohibited from relying upon the currently charged offenses in determining whether a pattern of criminal gang activity had been proven, nor was it instructed that it had to find that the benefit to the gang from the charged offenses was more than reputational. As the People note, evidence on these two points was presented to the jury that would have been sufficient to comply with these new statutory requirements, but as the trial took place long before the statute was amended, the jury was not asked to, and therefore did not, make the factual determinations that are now required by the

26

amendments to section 186.22.  To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate Lopez's right to a jury trial on all the elements of the charged allegations.  (*Ramos*, *supra*, 244 Cal.App.4th at pp. 103–104; *Figueroa*, *supra*, 20 Cal.App.4th at p. 71.)  We therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22.

As Lopez notes, Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22.  Here, two other statutes that refer specifically to section 186.22 are implicated:  section 190.2, subdivision (a)(22) and section 12022.53, subdivision (e)(1).  Section 190.2, subdivision (a)(22) establishes a gang murder special circumstance: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  As the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity, Lopez is entitled to the benefit of this change in the law.  The special circumstances findings under section 190.2, subdivision (a)(22) must be vacated; on remand, the People must be afforded the opportunity to prove this special circumstance in compliance with the amended section 186.22, subdivision (f).  We

27

note, however, that the jury's other special circumstance finding, the multiple murder special circumstance under section 190.2, subdivision (a)(3), remains unaffected by the statutory changes made by Assembly Bill 333.

Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony. The statute first provides for escalating punishments depending on how the firearm is used. The least severe penalty is set forth in section 12022.53, subdivision (b), which provides for a consecutive 10-year term for a defendant who "personally uses" a firearm in a felony. Next, a consecutive 20-year term is imposed under section 12022.53, subdivision (c), if the defendant "personally and intentionally discharges a firearm" in the commission of the offense. Finally, section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" during the commission of the offense.

While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed on any person who is a principal in the offense under certain gang-related circumstances: First, the person who is a principal must be "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" as set forth in section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A).) Second, "[a]ny principal in the offense" must have "committed any act specified in subdivision (b), (c), or (d)," that is, any principal involved in the offense must have

28

personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1)(B).)

Here, with respect to each murder, the jury found true the allegations that a principal in the offense was convicted of a felony committed for the benefit of a criminal street gang under section 186.22, subdivision (b), and personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(1), which caused great bodily injury or death to Robinson, Grant, and Lexing.  Because this enhancement depends on a finding that the principal was "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" as set forth in section 186.22, subdivision (b) (§ 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by Assembly Bill 333 require that the true findings on these enhancements, too, be vacated and the matter remanded to the trial court.  We note, however, that with respect to the murders of Lexing and Grant, the jury separately found true the allegation under section 12022.53, subdivision (d) that Lopez "personally and intentionally discharged a firearm . . . which caused great bodily injury or death" to Lexing and Grant.  Accordingly, Lopez was sentenced to two consecutive 25-years-to-life terms under section 12022.53, subdivision (d) for personally and intentionally discharging a firearm and proximately causing death in the murders of Lexing and Grant. Although we vacate the findings under section 12022.53, subdivision (e)(1), those findings under section 12022.53, subdivision (d), which carry the same penalty, remain intact.

## VI. Remaining Arguments

Lopez argues that if we conclude he failed to preserve any of the issues raised in his appeal, we should nonetheless consider those issues because he was denied the effective assistance of counsel in the trial court. As we have not determined that Lopez failed to preserve any of the issues he raised on appeal, no question arises here as to the effectiveness of the representation he received.

We reject Lopez's final contention that the cumulative effect of the claimed errors identified in his appeal deprived him of due process of law and a fair trial. Because we have found none of Lopez's claimed errors to constitute individual errors, they cannot as a group constitute cumulative error. (*People v. Richardson* (2008) 43 Cal.4th 959, 1036, abrogated on other grounds by statutory repeal as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 535.)

## DISPOSITION

The convictions are affirmed.  The gang enhancement allegation findings under section 186.22, the special circumstances findings under section 190.2, subdivision (a)(2), and the gang-related firearm enhancement findings under section 12022.53, subdivision (e) are vacated, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.

31